J. Irwin Shapiro, J.
This is an action to recover payment on four promissory notes, each in the sum of $112,500, to set aside as fraudulent a certain conveyance of real property, to recover the shares of stock of defendant Bonnie Apartments, Inc., and for damages. The action was tried before the court without a jury.
On August 18, 1960, the plaintiffs were the owners of all the outstanding shares of stock of the defendant Bonnie Apartments, Inc., a realty corporation, which was the owner of a certain parcel of land and building located in Queens County. On that date, the plaintiffs entered into an elaborate and detailed contract wherein they agreed to sell, and the defendant Wolitzer agreed to buy, the said shares of stock. Part of the purchase price was paid on the signing of the contract, part at the closing (hereinafter referred to as the first closing) which was scheduled for September 8, 1960, and part was to be paid on January 5, 1961 (hereinafter referred to as the second closing) at which time adjustments were to be made of the purchase price. The remainder was to be paid by the purchaser executing a promissory note for $450,000, payable six years after the date of closing of title, with a provision that if one half was paid in reduction of the note at maturity, the holders would extend the balance of the note for an additional year.
Wolitzer assigned the contract to the defendant Queens Bonnie Corp. prior to the time of the first closing. Pursuant to the contract, Queens Bonnie Corp. executed and delivered a Collateral Deposit Agreement at the time of the closing. This agreement, which was to be read with the original contract, acknowledged that Queens Bonnie Corp., as pledgor, was indebted to the plaintiffs, as pledgees, in the aggregate sum of $450,000, which was due and payable in September, 1966 in accordance with the terms of four collateral promissory notes dated September 1, 1960, each in the sum of $112,500, made to the order of each plaintiff respectively. It was provided, that in order to secure payment of the said indebtedness of $450,000 the pledgor would deliver to the defendant Morris Rosenblum, as attorney and *506 escrowee of the plaintiffs, all of the stock of Bonnie Apartments, Inc.
There then followed a number of provisions obviously designed to insure that as long as any indebtedness under the notes was unpaid, the pledgees would be secured by the shares of stock of Bonnie Apartments, Inc., the primary asset of the latter being the land and building sold by the pledgees to the pledgor. Thus, Bonnie Apartments, Inc., agreed not to alter its corporate structure, to give the pledgees notice of any large law or equity action or proceeding brought against it, to maintain the building and equipment in good order, to permit the pledgees “ and/or ” escrowee to conduct reasonable inspections, to file the required tax returns and not to borrow money without the consent of the pledgees.
In paragraph 36 of' the contract the sellers (plaintiffs) expressly consented to the liquidation of Bonnie Apartments, Inc., by the purchaser of the shares of stock in the latter corporation, “ providing the new corporation formed by the Purchaser will deposit the stock of such new corporation with morris roseublitm, attorney for the Sellers, as provided in the Collateral Deposit Agreement, which such new stock is to be subject to all of the terms and conditions as set forth in such Collateral Deposit Agreement as if such stock was originally deposited under such Collateral Deposit Agreement in lieu of the stock of Bonnie Apartments, Inc., and all of the terms and conditions in such Collateral Deposit Agreement shall apply to the new corporation to be formed in lieu of Bonnie Apartments, Inc.”
In paragraph 45 of the contract it was provided that: “ If as a result of the liquidation of Bonnie Apartments, Inc., title to the land and buildings are transferred to an individual, then, and in that event, the Sellers will accept a second mortgage in lieu of the note herein in the sum of $450,000.00, which second mortgage .shall be subject and subordinate to all of the terms and conditions of the aforesaid note in the sum of $450,000.00.” (Emphasis supplied.)
Queens Bonnie Corp. became the owner of plaintiffs’ stock in Bonnie Apartments, Inc., at the first closing held on September 8, 1960. By a deed, erroneously dated December 1, 1961 (subsequently corrected), but recorded on December 16,1960, Bonnie Apartments, Inc., transferred title to the real estate to Queens Bonnie Corp.
The second closing was held on January 5,1961. The pledgees were not informed of the fact that Bonnie Apartments, Inc., no longer owned the real estate nor of the fact that it was then an assetless corporate shell, nor was the stock of Queens Bonnie *507 Corp., the then owner of the fee, offered to the escrowee at that or at any time thereafter.
A certificate of dissolution of Bonnie Apartments, Inc., was executed on March 28, 1961, and was filed with the Department of State on September 5, 1961. A certificate of dissolution of Queens Bonnie Corp. was executed on December 8, 1961, and filed with the Department of State on April 24, 1962. Queens Bonnie Corp. transferred title to the real estate to defendant Queens Bonnie Company (a partnership) by a deed, dated January 1, 1962, which was recorded on March 27, 1962. A “ correction deed ” dated January 1,1962, from Queens Bonnie Corp. to Queens Bonnie Company was recorded on June 27, 1962. This deed recited that it was to correct the prior deed from Queens Bonnie Corp. to Queens Bonnie Company to set forth that the conveyance was subject to a certain mortgage dated January 1, 1962, in the sum of $450,000 given by Queens Bonnie Corp. to the plaintiffs.
In the early part of June, 1962 the defendants sent a copy of a proposed $450,000 second mortgage to the escrow agent. The plaintiffs appeared at the latter’s office and after examining the proposed instrument found it unacceptable and directed that it be returned to the defendants. Thereupon the defendants made changes in the mortgage in an attempt to have it meet plaintiffs ’ objections. The mortgage, as changed, was purportedly executed by Queens Bonnie Corp. on January 1, 1962 and was recorded by the defendants at an expense of $2,250 on June 27, 1962. The plaintiffs had no prior knowledge of the making, execution or intended recording of said mortgage, except that the escrowee was informed that the mortgage had been delivered to the title company for recording.
After it was recorded it was sent to the escrow agent together with a copy of a title insurance policy. The latter was instructed by a letter dated July 3,1962, from the plaintiffs’ present attorney, not to accept any mortgage on the premises of Queens Bonnie Corp. and to return and reject the same together with any title policy that might be offered in connection therewith, on the ground that it was not in accordance with the agreement between the parties. The plaintiffs commenced this action on or about July 11, 1962.
Without question the defendants, or some of them, breached both the original contract and the Collateral Deposit Agreement and in material respects defaulted in complying with their provisions. The transfer of the real property by Bonnie Apartments, Inc., to Queens Bonnie Corp. was effected in direct contravention of paragraph 15-c of the Collateral Deposit *508 Agreement. As a result thereof the clear purpose and intent of that agreement was completely avoided. The escrow agent was thereby left holding the shares of stock in a corporation (Bonnie Apartments, Inc.) which no longer had any interest in the property and which instead of acting as security for the plaintiffs were worthless.
The defendants also breached the Collateral Deposit Agreement and paragraph 36 of the original contract when they dissolved Bonnie Apartments, Inc., and did not deliver the stock of Queens Bonnie Corp., the transferee of the fee, to the escrow agent. Since pursuant to the said paragraph 36, all of the terms and conditions of the Collateral Deposit Agreement were to apply to any new owner receiving title to the premises from Bonnie Apartments, Inc., Queens Bonnie Corp. was bound by the provisions of paragraph 15-c of the Collateral Deposit Agreement not to sell the property without compliance with the conditions therein specified. The sale by this corporation to Queens Bonnie Company, a partnership, without such compliance was thus a violation of the agreement as was the subsequent dissolution of that corporation.
Paragraph 16 of the Collateral Deposit Agreement provides that the ‘ ‘ omission or failure of the Pledgor to comply with' any of the items referred to in the preceding paragraph numbered ‘ 15 ’ shall constitute a default under the terms of this agreement and pledge and/or promissory notes and the remaining unpaid balance due thereon shall immediately become due and payable, and in such event the escrowee and Pledgees shall have the right to sell the shares of stock so pledged hereunder in the same manner and upon the same terms and conditions and with the same benefits to the Pledgees as hereinbefore expressed with respect to the default of other kinds, without notice to the Pledgor except the five days notice of sale of said stock at public or private sale as hereinbefore expressed.”
The defendants contend that paragraph 16 is limited by paragraph 11 and, accordingly, acceleration could not ensue until after the plaintiffs had given the pledgor five days’ notice to cure any default and that, in any event, the plaintiffs had waived the right to accelerate the principal. The portion of paragraph 11 upon which the defendants rely reads as follows: “ or upon default in the performance of any of the terms, covenants, conditions and warranties of the within pledge agreement other than those defaults hereinbefore already mentioned, and such default is not cured within five days after receipt of written notice from the escrowee or Pledgees, (or if the matter *509 takes longer than five days to cure, the failure to start to cure the same within the said five day period) ”. The balance of paragraph 11 refers to default in payments due on the notes or the first mortgage and it is obvious, from a reading of that paragraph as a whole together with paragraph 16, that it pertain to defaults other than those specifically enumerated in paragraph 15. The conditions enumerated in the latter paragraph differ from those set forth elsewhere in that they pertain exclusively to the security given by the pledgor and constitute the heart of the Collateral Deposit Agreement. That being the case, it is obvious that paragraph 16 is not subordinate to paragraph 11, and that its remedies are in addition to the remedies listed in paragraph 11. Paragraph 16 specifically states that the unpaid balance shall immediately become due and payable without notice to the pledgor.
The defendants’ claim of a waiver stems from the fact that payments of interest were made by Queens Bonnie Corp. commencing on March 8, 1961, and by Queens Bonnie Company commencing on February 23,1962, and that the plaintiffs accordingly had, or should have had, notice that the property had been transferred. The plaintiff Philip Tymon testified on the trial that neither he nor the other plaintiffs had actual knowledge of the transfer until July, 1962, and I find that to be the fact. No notice of the transfer could be imputed to the plaintiffs from the fact that Queens Bonnie Corp. made the payments from March 16 to December 13, 1961, since that corporation, as pledgor, was obligated to pay the interest on the notes whether or not it had taken title to the real estate from Bonnie Apartments, Inc.
Queens Bonnie Company, the partnership, made two payments of interest, one in February and the other in June, 1962. That fact however, even if noted by the plaintiffs, could merely have indicated that the partnership had purchased the stock of Bonnie Apartments, Inc., or of Queens Bonnie Corp., and assumed their liabilities, rather than that it had purchased the fee of the real property.
Moreover, there was nothing in the mode or manner of payment likely to call the plaintiffs’ attention to the fact that there was a new payer. The checks which were used to make the payments in January, 1962 were drawn on the same bank that Queens Bonnie Corp. had used and were virtually identical in design, the only difference being that the printed name of the drawer was changed from “ Queens Bonnie Corp.” to “ Queens Bonnie Co.” The same individuals continued to sign the checks. *510 In any event, the initial default took place on December 8,1960, and the first payment, made by Queens Bonnie Company, was in February of 1962. Furthermore, paragraph 14 of the Collateral Deposit Agreement provides as follows: ‘1 No remedy or right herein conferred upon or reserved to the Pledgees shall be intended to be to the exclusion of any other remedy or right, but each and every such remedy or right shall be cumulative and shall be in addition to every other remedy or right given hereunder and now or hereafter existing at law or in equity. No delay or omission by the Pledgees to exercise any remedy or right accruing upon any default shall impair any such remedy or right, nor shall the same be construed to be a waiver of any such default or acquiescence therein, nor shall it effect any subsequent default of the same or of a different nature. No single or partial exercise of any right, power or remedy shall preclude other or further exercise thereof or the exercise of any other right, power or remedy.”
I find as a fact that there was no waiver by the plaintiffs of the actions of the defendant Queens Bonnie Corp. in causing the real estate of Bonnie Apartments, Inc., to be transferred to it and in thereafter transferring the said real estate to Queens Bonnie Company without complying, or even attempting to comply, with the requirements of the agreements between the contracting parties.
The plaintiffs therefore contend that since upon the indicated breaches, the principal sum, by the very terms of the agreement, became ‘ ‘ immediately due and payable ’ ’, acceleration was automatic. I do not agree. Although there is authority in a minority of jurisdictions, as well as in New York, to the effect that such language brings about an automatic acceleration (Banzer v. Richter, 68 Misc. 192, affd. 146 App. Div. 913), the better view seems to be that the pledgee has the option of declaring or not declaring an acceleration (Keene Five Cent Sav. Bank v. Reid, 123 F. 221, 224, cert. denied 191 U. S. 567; 6 Williston, Contracts [Rev. ed., 1938], § 2025, p. 5683; Professor Zechariah Chafee, Jr., 32 Harv. L. Rev. 747; Ann. 159 A. L. R. 1077,1088) and this seems to be the tenor of the New York oases subsequent to the decision in Banzer (supra); Wurzler v. Clifford (36 N. Y. S. 2d 516); Matter of Steinway (174 Misc. 554) and Candee, Smith & Howland Co. v. Bendish Contr. Co. (148 Misc. 262). Any other holding would take the option of accelerating or not accelerating away from the pledgee for whose benefit the clause is placed in the contract and give it to the pledgor. Adopting the rule of automatic acceleration would enable a debtor, who is obligated to pay a high rate of interest over a long period of *511 time, by deliberately defaulting, to compel an obligee to accept immediate payment of the debt contrary to the intention of the parities and to the detriment of the obligee. Professor Williston in his monumental work on Contracts (supra) in discussing the law on this subject said (p. 5683): “ Contracts frequently provide that on failure to pay one of several instalments at maturity the whole performance becomes due. English courts have interpreted this literally and, therefore, have held that after lapse of the statutory period from the first failure no recovery can be had even for a breach of a subsequent instalment, and the same rule has been applied in some cases in the United States. It seems, however, a fairer construction of such a provision— obviously intended as it is solely for the advantage and security of the creditor — to hold that the acceleration of maturity does not occur unless the creditor so elects, even though in terms the provision is absolute.”
In this case, therefore, I hold as a matter of law that the provision for acceleration was not self-operative and could be brought into being only by an election to accelerate affirmatively exercised by the plaintiff obligees.
Such an election may be evidenced by some unequivocal overt act evidencing the election to accelerate or by the institution of a lawsuit on the obligation as accelerated. It must be made, however, before the pledgor or obligor has cured his default (Albertina Realty Co. v. Rosbro Realty Corp., 258 N. Y. 472, 475; 446 West 44th St. v. Riverland Holding Corp., 267 App. Div. 135, 137; Randell v. Protter, 150 N. Y. S. 2d 240; Seamen’s Bank for Sav. v. Wallenstein, 6 N. Y. S. 2d 706).
The defendants, although not conceding that they breached any of the terms of the agreement, claim in effect, that even if they did, those breaches were cured when they furnished a second mortgage in conformity with their obligations prior to the exercise of any election to accelerate by the plaintiffs.
Paragraph 45 of the contract obligated the contracting defendants to deliver and the plaintiffs to accept the second mortgage if title to the real property were conveyed to individual owners. In such case the mortgage would be substituted for and stand in lieu of the four corporate promissory notes. In this case, at the time the mortgage was placed on record and through the escrowee, delivered to the plaintiffs, the realty had been conveyed to individuals, the partnership known as Queens Bonnie Co., thus complying with that requirement of the agreement.
There is nothing in paragraph 45 which even inferentially implies that the second mortgage must be executed by the individuals to whom title is conveyed, nor is there any provision for *512 personal liability on the part of the mortgagor. The second mortgage which was recorded and thereafter delivered to plaintiffs’ escrowee was executed by a corporation and not by the individual transferees of the realty, but since there was no provision in the agreement that the mortgage carry with it any personal obligation on the part of the mortgagor, that circumstance is of no consequence.
Upon the trial both sides agreed that the agreements were unambiguous and I thereupon ruled out all proffered testimony as to what was said prior to the time that the agreements were entered into. Without such oral testimony, however, it is quite apparent to me why the provision for the execution of a mortgage was put into the agreement. So long as the fee was owned by a corporation the deposit with the escrowee of all of the outstanding shares of stock in the corporation, coupled with other prohibitions placed upon the corporation, gave the plaintiffs complete security for their $450,000. However, once the realty was conveyed to an individual, or as here, to a group of individuals, the pledge of shares of stock in the former corporate fee owner would give the plaintiffs no security whatever. Under the circumstances it was quite natural for the agreement to provide that upon such a transfer the plaintiffs would be given a lien on the realty by way of a second mortgage in lieu of the obligation evidenced by the promissory notes, so that thereafter the property would continue as security for the indebtedness due the plaintiffs. That is exactly what happened here and since the plaintiffs by way of the recorded mortgage, and the title policy guaranteeing its validity, have received everything for which they bargained, and since those instruments were forwarded to the plaintiffs prior to the attempt by them to accelerate the due date of the indebtedness, they may not recover in this action.
Under the circumstances, judgment is directed in favor of the defendants, but without costs, on condition that the aforesaid mortgage and title policy be delivered to the plaintiffs at a time and place to be specified in the judgment to be entered hereon, at which time and place in exchange for such mortgage and title policy the plaintiffs will surrender the four promissory notes, each in the sum of $112,500, now held by them.